2002 D.S.D. 27.

**GATEWAY, INC., Plaintiff,**

v.

**COMPANION PRODUCTS, INC. Defendant.**

**No. CIV.01–4096–KES.**

United States District Court,
D. South Dakota,
Southern Division.

Sept. 27, 2002.

Douglas Rettew, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, Washington, DC, Douglas S. Weinstein, Roger D. Taylor, Virginia L. Carron, Finnegan, Henderson, Farabow, Garrett & Dunner, Atlanta, GA, Lee A. Magnuson, Lynn, Jackson, Shultz & Lebrun, P.C., Sioux Falls, SD, for Plaintiff.

Karen L. Wade, Marina T. Larson, Oppedahl & Larson, LLP, Dillon, CO, Mark V. Meierhenry, Robin J. Houwman, Danforth, Meierhenry & Meierhenry, Sioux Falls, SD, for Defendant.

ORDER GRANTING SUMMARY JUDGMENT IN PART AND DENYING SUMMARY JUDGMENT IN PART

SCHREIER, District Judge.

[¶ 1] Plaintiff, Gateway, Inc., brings this action against defendant, Companion Prod-

ucts, Inc. (CPI), seeking an injunction and damages for CPI's alleged use of Gateway's cow spots and "Welcome to Gateway Country" trademarks. Gateway alleges in its complaint the following causes of action: false designation of origin and unfair competition in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and the common law of South Dakota; trademark infringement in violation of 15 U.S.C. §§ 1051–1127 and the common law of South Dakota; trademark dilution in violation of 15 U.S.C. § 1125(c); and deceptive trade practices in violation of SDCL 37–24–6(1) and the common law of South Dakota. CPI asserts the affirmative defenses of functionality, laches and acquiescence, no likelihood of confusion, and no dilution. In its counterclaim, CPI seeks declaratory judgment of no trademark infringement, no unfair competition, and no dilution. It also seeks cancellation of Gateway's trademark registration for misuse. CPI alleges that Gateway tortiously interfered with CPI's business relationships, defamed CPI, and disparaged CPI. CPI moves for summary judgment on all of Gateway's causes of action. Gateway moves for summary judgment on CPI's counterclaims of cancellation of registration for misuse, tortious interference with business relationships, defamation, and disparagement. Gateway also moves for summary judgment on its trademark infringement causes of action.

### FACTS

[¶ 2] Gateway is a corporation based in North Sioux City, South Dakota, that sells computers and computer accessories throughout the world. Gateway began in 1985. Around 1991, Gateway began using black and white cows and spots as its company symbol. It also used the theme, "Welcome to Gateway Country" and "Gateway Country" in association with its stores. In 1992, Gateway registered its trademarks for the cow-spots design and the slogan. Both trademarks are used in association with Gateway's computers, computer products, and computer accessories. Gateway has launched extensive advertising campaigns during the last ten years. It has also placed its trademark on popular television shows and sponsored various sporting events. Through these efforts, Gateway has attempted to achieve publicity for and world-wide recognition of its cow-spots design.

[¶ 3] CPI, a Colorado company, sells plush stuffed animals called "stretch pets" that wrap around computer monitors, CPUs, or televisions. These stretch pets include a variety of animals, such as a polar bear, moose, and penguin. One of its top selling products is a black and white spotted cow, "Cody Cow," which CPI has sold since 1999. CPI sells these products directly over the internet, through retail stores, and indirectly at the wholesale level. CPI advertises its stretch pets through flyers, catalogs, the internet, magazines, and phone calls to various retailers. CPI has used the phrase "Welcome to Stretch Pet Country" in some of its advertisements.

[¶ 4] Gateway sent a cease and desist letter to CPI on December 8, 2000, which notified CPI that its Cody Cow infringed on Gateway's trademark and that if sales of Cody Cow did not cease, Gateway would file suit. An employee of Gateway purchased Cody Cow from CPI's stretch pet website. CPI refused to stop production of Cody Cow. On February 7, 2001, counsel for CPI informed Gateway that Cody Cow did not infringe on Gateway's trademark rights. Gateway filed suit on April 27, 2001.

### SUMMARY JUDGMENT STANDARD

[¶ 5] Under Rule 56(c) of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if the movant

can "show that there is no genuine issue as to any material fact and that [the movant] is entitled to judgment as a matter of law." In determining whether summary judgment should issue, the facts and inferences from those facts are viewed in the light most favorable to the nonmoving party, and the burden is placed on the moving party to establish both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material fact exists, the court views the evidence presented based upon which party has the burden of proof under the underlying substantive law. *Anderson*, 106 S.Ct. at 2513.

## CPI'S MOTION FOR SUMMARY JUDGMENT

## DISCUSSION

### [¶ 6] I. The Lanham Act—Trade Dress Infringement

[¶ 7] CPI moves for summary judgment on Gateway's claim that CPI violated 15 U.S.C. § 1125(a)(1). "Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1), creates a federal cause of action for trade dress infringement." *Insty*Bit, Inc. v. Poly–Tech Indus., Inc.*, 95 F.3d 663, 667 (8th Cir.1996). A product's trade dress is the "total image of a product, the overall impression created, not the ·individual features." *Id.* A trade dress is protected under § 43(a) of the Lanham Act if: "(1) it is inherently distinctive or has acquired

distinctiveness through secondary meaning, (2) it is primarily nonfunctional; and (3) its imitation would result in a likelihood of confusion in consumers' minds as to the source of the product." *Id.*

### [¶ 8] A. Functionality

[¶ 9] CPI alleges that its use of the black and white spots on Cody Cow is a functional use only. CPI claims it is imitating the spots of a cow and is not using the cow spots as a designation of origin. The issue of functionality is a question of fact. *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 868 (8th Cir.1994); *Vuitton Et Fils S.A. v. J. Young Enters., Inc.*, 644 F.2d 769, 775 (9th Cir.1981). Because Gateway's mark is registered, it is entitled to a presumption that the mark is valid. *Aromatique*, 28 F.3d at 869. In fact, registered marks "are presumed to be distinctive and nonfunctional." *Id.*

[¶ 10] Functionality has long been a defense to a claim of trademark or trade dress infringement. *Home Builders Ass'n of Greater St. Louis v. L & L Exhibition Mgt., Inc.*, 226 F.3d 944, 948 (8th Cir.2000). "In general terms, a product feature is functional if it·is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). "Before a trademark or trade dress will be denied Lanham Act protection under the functionality doctrine, *Qualitex* requires a court to find that exclusive use of that feature would put competitors at a *significant* non-reputation-related disadvantage." *HBA*, 226 F.3d at 948 n. 5. " 'The fact that the feature at issue serves some function is not enough; to be functional in the trade dress sense, the future must be necessary to afford a competitor the means to compete effectively.' " *Id.* at 948 (quoting *Thomas & Betts Corp. v.*

*Panduit Corp.*, 138 F.3d 277, 297 (7th Cir. 1998)).

**[¶ 11]** Applying these principles while viewing the evidence most favorably to Gateway, there is an issue of material fact as to whether CPI has rebutted the presumption that Gateway's mark is non-functional. CPI has presented no evidence that its use of black and white spots on a plush cow that wraps around a computer monitor or CPU is essential to the use or purpose of a stretch pet. A brown, red, or black cow are equally as useful. There is no evidence that a black and white spotted cow costs less to produce or is of a higher quality than solid-colored cows. Furthermore, it is a question of fact as to whether Gateway's exclusive use of black and white cow spots on computer accessories puts competitors at a significant non-reputation-related disadvantage. It is a question of material fact for the jury to determine after considering all the evidence whether CPI's use of the black and white spots on Cody Cow is a functional use or if the spots are being used to indicate sponsorship or origin.

## [¶ 12] B. Likelihood of Confusion

**[¶ 13]** To determine whether a likelihood of confusion exists in a trade dress case, the court must consider (1) the strength of the marks; (2) the similarity between the parties' marks; (3) the competitive proximity of the parties' [products]; (4) CPI's intent to confuse; (5) evidence of actual confusion; and (6) the degree of care reasonably expected of potential customers. *Insty*Bit*, 95 F.3d at 667.

## [¶ 14] 1. Strength of the Mark

**[¶ 15]** The court must first consider the strength of Gateway's mark. The strength, or distinctiveness, of a trademark is its power to identify the source of a product or services. *Time, Inc. v. Peter-*

*sen Publ'g Co.*, 173 F.3d 113 (2d Cir.1999). Three factors determine the strength of a trademark: the classification of the trademark, whether the trademark is registered, and the nature, extent, and use of the trademark by others. *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626–27 (8th Cir.1987).

[¶ 16] Classification refers to whether a mark is generic, fanciful, descriptive, or arbitrary. *HBA*, 226 F.3d at 949. An arbitrary mark is a common word, symbol, or picture that is applied to a good or service in an unfamiliar manner. *Insty*Bit*, 95 F.3d at 673. Arbitrary marks are inherently strong marks because they primarily identify the product rather than describe it. *HBA*, 226 F.3d at 949. Such marks are entitled to full trademark protection. *Id.* Viewing the evidence in the light most favorable to Gateway, Gateway's cow spots is an arbitrary mark because cow spots have no connection to computers or computer products.

**[¶ 17]** Registration of a mark is prima facie evidence of the mark's validity, the registrant's ownership of the mark, and the registrant's exclusive right to use the mark. *General Mills*, 824 F.2d at 626. Gateway's mark is registered. Registration does not conclusively prove infringement, however. *Id.* Evidence that other companies frequently use the registrant's mark undermines the mark's strength and indicates relative weakness in the market. *Id.* at 627.

[¶ 18] In addition to these factors, the strength of the mark relates to its effect on consumers: the public will remember a mark that is strong because of its fame or uniqueness and is more likely to associate it with a large variety of products than a weak or unknown mark. *James Burrough, Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 276 (7th Cir.1976). *See Arrow Distilleries v. Globe Brewing Co.*, 117 F.2d

347, 349 (4th Cir.1941) (a distinctive mark stimulates more sales because consumers associate it with similar marks on other goods). "A strong and distinctive trademark is entitled to greater protection than a weak or commonplace one." *SquirtCo v. Seven–Up Co.*, 628 F.2d 1086, 1091 (8th Cir.1980).

[¶ 19] Strength is also closely tied to the fame of the mark. *Kenner Parker Toys, Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 353 (Fed.Cir.1992). The more publicly recognized a mark, the more protection it deserves and will receive. *Id.* "[T]he Lanham Act's tolerance for similarity between competing marks varies inversely with the fame of the prior mark. As a mark's fame increases, the Act's tolerance for similarities in competing marks falls." *Id.*

[¶ 20] Viewing the evidence in the light most favorable to Gateway, there is evidence that Gateway's cow-spot mark is a strong, distinctive, and widely recognized mark. Because it is an arbitrary mark, and because the mark is registered, the mark is strong. Gateway has sent cease and desist letters and commenced litigation to maintain the exclusivity of its mark. There is evidence that Gateway engaged in an extensive, ten-year advertising campaign that raised public recognition of Gateway's mark and resulted in consumers associating the cow-spot mark with Gateway's computer products. The cow-spots design is acknowledged in a book as one of the world's most recognized trademarks. From the viewpoint of Gateway, there is evidence that Gateway's mark is strong and deserves the utmost protection.

**[¶ 21] 2. The Similarity Between the Parties' Marks**

[¶ 22] The second factor the court must consider to ascertain the likelihood of confusion is the similarity of the parties' marks. In determining whether the parties' marks are similar, the court

"must evaluate the impression that each mark in its entirety is likely to have on a purchaser exercising the attention usually given by purchasers of such products." *Duluth News–Tribune v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1097 (8th Cir.1996). "Where the products are closely related, less similarity in the trademarks is necessary to support a finding of infringement." *SquirtCo. v. Seven–Up Co.*, 628 F.2d 1086, 1091 (8th Cir.1980) (citing *David Sherman Corp. v. Heublein, Inc.*, 340 F.2d 377, 380 (8th Cir.1965)). Furthermore, similarity is based on the products viewed in their entirety. *Id.*

[¶ 23] Viewing the evidence in the light most favorable to Gateway, Cody Cow is similar to Gateway's cow-spots trademark. And CPI's statement, "Welcome to Stretch Pet Country," is similar to Gateway's mark, "Welcome to Gateway Country." A reasonable jury could find a strong similarity between Gateway's marks and CPI's product.

**[¶ 24] 3. The Competitive Proximity of the Parties' Products**

[¶ 25] The third factor to consider in determining whether there is a likelihood of confusion is the competitive proximity of the parties' products. "The greater the similarity between products and services, the greater the likelihood of confusion." *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 202 (5th Cir.1998). The products need not directly compete, however, for there to be confusion. *SquirtCo.*, 628 F.2d at 1091. Indeed, trademark law protects against infringement even when the products do not directly compete. *Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 399 (8th Cir. 1987).

[¶ 26] Gateway sells not only computers but also computer related products and accessories in its Gateway Country stores.

Gateway's products are sold worldwide, and Gateway advertises through a plethora of media, including magazines, catalogs, retail stores, and the Internet. CPI conducts most of its sales through the internet, catalogs, retail stores, and novelty shops. Viewing the evidence in the light most favorable to Gateway, a reasonable jury could find that the parties' products are in competitive proximity to each other.

#### [¶ 27] 4. The Alleged Infringer's Intent to Confuse

█ [¶ 28] The fourth factor in determining the likelihood of confusion is defendant's intent to "pass off" its products as those of plaintiff. "Proof of an intent to confuse the public is not necessary to a finding of a likelihood of confusion," but "[i]f a mark was adopted with the intent to confuse the public, that alone may be sufficient to justify an inference of a likelihood of confusion". *Elvis Presley Enters.*, 141 F.3d at 203. *See Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha,* 754 F.2d 591, 596 (5th Cir.1985) (good faith is not a defense to infringement, and bad faith alone may prove infringement). "[A] defendant who purposely chooses a particular mark because it is similar to that of a senior user is saying, in effect, that he thinks that there is at least a possibility that he can divert some business from the senior user-and the defendant ought to know at least as much about the likelihood of confusion as the trier of fact." *Little Caesar Enters., Inc. v. Pizza Caesar, Inc.,* 834 F.2d 568, 572 (6th Cir.1987). Defendant's intent to copy alone does not sufficiently indicate confusion. Rather, the necessary intent focuses on a "purposeful manipulation" of defendant's mark to resemble the plaintiff's. *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 226 (3d Cir.2000).

[¶ 29] There is evidence that indicates that CPI patterned Cody Cow after a cow bought at a Gateway Country store. CPI asked Gateway whether it wanted to market Cody Cow in its stores. CPI's greeting of "Welcome to Stretch Pet Country" is similar to Gateway's greeting of "Welcome to Gateway Country." Viewing the evidence in the light most favorable to Gateway, a reasonable jury could conclude that CPI intended to "pass off" its products as those of Gateway's and to copy Gateway's products.

#### [¶ 30] 5. Evidence of Actual Confusion

█ [¶ 31] The fifth factor the court must consider in determining whether a likelihood of confusion exists is evidence of actual confusion. Although a plaintiff is not required to prove any instances of actual confusion, "when determining whether there exists a likelihood of confusion, weight is given to the number and extent of instances of actual confusion." *Duluth News–Tribune,* 84 F.3d at 1098 (quoting *Life Technologies, Inc. v. Gibbco Scientific, Inc.,* 826 F.2d 775, 777 (8th Cir.1987)). Manifestations of actual confusion serve as strong evidence of the likelihood of confusion. *Mutual of Omaha,* 836 F.2d at 400. The marks must mislead an appreciable number of reasonable consumers to be considered evidence of actual confusion. *Duluth News–Tribune,* 84 F.3d at 1099. Surveys can supply such evidence, "but their evidentiary value depends on the relevance of the questions asked and the technical adequacy of the survey procedures." *ConAgra, Inc. v. George A. Hormel & Co.,* 990 F.2d 368, 370 (8th Cir.1993).

[¶ 32] Here, Gateway conducted a nationwide survey to determine actual confusion among consumers as to the source of CPI's product. The survey concluded that 39 percent of those surveyed identified Gateway as the source of CPI's Cody Cow. CPI alleges that the survey was flawed. Most of CPI's arguments concerning the

flaws, however, go to the weight the trier of fact should place on the survey results, rather than rendering the issue of actual confusion beyond genuine dispute. Viewing the survey evidence in the light most favorable to Gateway, the evidence is sufficient to show that actual confusion exists among reasonable consumers.

### [¶ 33] 6. The Degree of Care Reasonably Expected of Potential Customers

[¶ 34] The final factor for the court to weigh in determining whether there is a likelihood of confusion is the degree of care reasonably expected of potential customers. In evaluating this factor, the court must consider the degree of care expected of an ordinary purchaser. *Duluth News–Tribune*, 84 F.3d at 1096. In addition, the court can examine defendant's labeling, packaging, or other attempts to distinguish its products from plaintiffs. *Mutual of Omaha*, 836 F.2d at 401.

[¶ 35] Gateway classifies Cody Cow as an impulse buy. Since it is relatively cheap, consumers are likely to put less consideration and thought into purchasing this item. *ConAgra, Inc. v. Geo. A. Hormel & Co.*, 784 F.Supp. 700, 736 (D.Neb. 1992). Thus, Gateway asserts that typical consumers will not exercise a high standard of care when purchasing CPI's product. This increases the likelihood of consumer confusion when viewed in the light most favorable to Gateway. After weighing all the factors and viewing the evidence in the light most favorable to the nonmoving party, Gateway, the court finds that a reasonable jury could conclude that CPI's use of Gateway's mark creates a likelihood of confusion, deception or mistake among an appreciable number of ordinary buyers as to the source of or association between Cody Cow and Gateway.

### [¶ 36] C. Inherently Distinctive or Secondary Meaning

[¶ 37] An arbitrary mark is deemed inherently distinctive and is entitled to protection because its "intrinsic nature serves to identify a particular source of a product." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753, 2757–58, 120 L.Ed.2d 615 (1992). A descriptive mark merits protection only if it has acquired a secondary meaning, *Insty*Bit*, 95 F.3d at 673. "A trademark or trade dress has acquired secondary meaning if it has 'by long and exclusive use and advertising ... become so associated in the public mind with such goods ... that it serves to identify them and distinguish them from other goods.'" *Insty*Bit*, 95 F.3d at 673 (quoting *Stuart Hall Co. v. Ampad Corp.*, 51 F.3d 780, 789 (8th Cir.1995)).

[¶ 38] Viewing the evidence in a light most favorable to Gateway, a genuine issue of material fact exists as to both inherent distinctiveness and secondary meaning. A reasonable trier of fact could conclude that the cow-spots mark on computer accessories is arbitrary. Similarly, there is evidence that the cow spots have acquired secondary meaning in light of the evidence of Gateway's ten-year record of advertising and promotion in the market place resulting in consumers associating black and white cow spots on computer products with Gateway. Thus, CPI is not entitled to summary judgment on Gateway's § 43(a) claim.

### [¶ 39] II. The Lanham Act—Trademark Infringement

[¶ 40] A trademark is defined in the Lanham Act as "(1) a 'symbol,' (2) 'use[d] ... as a mark,' (3) 'to identify and distinguish the seller's goods from goods made or sold by others,' but that it not be 'functional.'" *Qualitex Co. v. Jacobson*

*Prods., Co.,* 514 U.S. 159, 165, 115 S.Ct. 1300, 1304, 131 L.Ed.2d 248 (1995) (quoting J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 3.01[1] (4th ed.2002)). Color "can act as a symbol that distinguishes a firm's goods and identifies their source, without serving any other significant function." *Id.* Color alone can meet the legal requirements for designation as a trademark, *Id.* A combination of colors together with a distinctive arbitrary design may also serve as a trademark. *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 204 (2d Cir.1979). Animal or animal designs arbitrarily used to identify the source of products also meets the legal requirements for designation as a trademark. *See Animal Fair, Inc. v. AMFES-CO Indus., Inc.,* 620 F.Supp. 175 (D.Minn. 1985), *aff'd without opinion,* 794 F.2d 678 (8th Cir.1986) (bear foot trademark used on slippers subject to trademark protection).

[¶ 41] Gateway has an incontestible registered trademark for black and white cow spots, Gateway uses its cow-spots trademark to distinguish its computer products and its computer accessories from goods made by others. Gateway does not claim a trademark in all uses of black and white cow spots, but it does claim a trademark in the use of black and white cow spots used with computers and computer accessories.[1]

[¶ 42] To prevail under the Lanham Act in a trademark infringement action, "plaintiff must prove that defendants' use of the [mark] creates a likelihood of confusion, deception, or mistake among an appreciable number of ordinary buyers as to the source of or association between the two [marks]." *Duluth News–Tribune,* 84 F.3d at 1096. Plaintiffs must demonstrate that defendants' use of the mark is likely to confuse ordinary buyers as to whether plaintiffs have sponsored, endorsed, or are otherwise affiliated with the defendants' products. *Hubbard Feeds Inc. v. Animal Feed Supplement, Inc.,* 182 F.3d 598, 602 (8th Cir.1999). The likelihood of consumer confusion is the "hallmark of any trademark infringement claim." *Minnesota Mining & Mfg. Co. v. Rauh Rubber, Inc.,* 130 F.3d 1305 (8th Cir.1997) (quoting *Polymer Technology Corp. v. Mimran,* 37 F.3d 74, 80 (2d Cir.1994)).

[¶ 43] To determine whether a likelihood of confusion exists, the court must consider (1) the strength of the marks; (2) the similarity between the parties' marks; (3) the competitive proximity of the parties' [products]; (4) defendant's intent to confuse; (5) evidence of actual confusion; and (6) the degree of care reasonably expected of potential customers. *Duluth News–Tribune,* 84 F.3d at 1096 (citing *Anheuser–Busch, Inc. v. Balducci Publications,* 28 F.3d 769, 774 (8th Cir.1994), *cert. denied,* 513 U.S. 1112, 115 S.Ct. 903, 130 L.Ed.2d 787 (1995)). Based on the analysis set forth in section (I)(B), *supra,* the court finds after viewing the evidence in the light most favorable to Gateway that a genuine issue of material fact exists as to whether CPI's use of the cow spots on Cody Cow creates a likelihood of confusion. Thus, summary judgment is denied to CPI on this issue.

### [¶ 44] III. State Common–Law Claims of Trademark Infringement

[¶ 45] In South Dakota, the federal "likelihood of confusion" test is applied to trademark infringement actions brought under state common law. *Phipps Bros., Inc. v. Nelson's Oil & Gas, Inc.,* 508 N.W.2d 885, 886 n. 2 (S.D.1993). Based on

---

1. Black and white cow spots are in no way essential to the operation of computer equipment or computer accessories and to that extent are not a functional aspect of Gateway's products.

the analysis set forth in section (I)(B) *supra*, the court finds, after viewing the evidence in the light most favorable to Gateway, that a genuine issue of material fact exists as to whether CPI's use of the cow spots on Cody Cow creates a likelihood of confusion. Thus, summary judgment is denied to CPI on this issue.

## [¶ 46] IV. Dilution of the Trademark

[¶ 47] The theory of dilution is distinct from trademark infringement. *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 832 (8th Cir.1999). *See McCarthy*, § 24.70 (dilution prevents more than just the likelihood of confusion). "Dilution occurs when consumers associate a famous mark that has traditionally identified the mark holder's goods with a new and different source." *Luigino's*, 170 F.3d at 832. Because consumers link the famous mark to other products, "the subsequent mark weakens, or dilutes, the famous mark's unique and distinctive link to a particular product." *Id.* To be covered by the anti-dilution statute, Gateway must prove that CPI is making a commercial use of the mark. 15 U.S.C. § 1125(c). In addition, to prove dilution, a plaintiff must establish (1) that its mark is famous, (2) that defendant used a similar or identical mark after plaintiff's mark became famous, and (3) and that defendant's mark dilutes the distinctive quality of plaintiff's mark by causing consumers to connect the plaintiff's mark with different products. *Luigino's*, 170 F.3d at 832.

## [¶ 48] A. Commercial Use of the Mark

[¶ 49] The federal anti-dilution statute requires a commercial use of the mark. 15 U.S.C. § 1125(c). A mark is used "in commerce (1) on goods when—(A) it is placed in any manner on goods ... and (13) the goods are sold or transported in commerce[.]" 15 U.S.C. § 1127. There is evidence that CPI sells Cody Cow in commerce. Thus, viewing the evidence in the

light most favorable to Gateway, there is evidence of a commercial use of Gateway's cow-spots trademark.

## [¶ 50] B. Mark Must be Famous

[¶ 51] The federal anti-dilution statute lists non-exclusive factors to determine whether a mark is famous: (1) the degree of distinctiveness of the mark, (2) the duration and extent of use of the mark in relation to the goods with which the mark is used, (3) the duration and extent of advertising and publicity of the mark, (4) the geographical extent of the trading area where the mark is used, (5) the channels of trade for the goods with which the mark is used, (6) the degree of recognition of the mark, and (7) the nature and extent of use of same or similar marks by other parties. 15 U.S.C. § 1125(c)(1).

[¶ 52] Gateway argues that its mark is famous because its cow-spots design is distinctive in the computer industry. It has used the mark for over ten years and has launched extensive advertising campaigns to publicize the mark. Gateway sells computer products worldwide, the cow-spots mark adorns all of the computer products sold by Gateway, and the mark is recognized across the globe. Gateway has evidence that it policed its mark vigilantly to prevent cow spots on other companies' computer products. The mark is registered and has obtained an incontestible status. Viewing the evidence in the light most favorable to Gateway, there is sufficient evidence from which a reasonable jury could conclude that the cow-spot mark is famous.

## [¶ 53] C. CPI's Use of the Same or Similar Mark

[¶ 54] "To support an action for dilution ... 'the marks must at least be similar enough that a significant segment of the target group of customers sees the

two marks as essentially the same.' " *Luigino's,* 170 F.3d at 832. The legislative history of the dilution statute does not explicitly require an identity of the marks when determining similarity. *McCarthy,* § 24:90.2. Gateway contends that its cowspots mark is identical to CPI's Cody Cow. Gateway also cites its survey, which calculated consumer confusion at 39 percent, as proof that the marks are so similar that consumers cannot distinguish between them. Gateway has presented sufficient evidence for a reasonable jury to find that CPI's Cody Cow is similar to Gateway's mark.

**[¶ 55] D. Consumer Connection of the Mark with Other Products**

[¶ 56] Dilution results when consumers associate a famous mark with a new product. *Luigino's,* 170 F.3d at 833. The doctrine typically applies when "similar marks are used on dissimilar goods." *Id.* In this case, Gateway argue that consumers associate its cow-spots-mark with CPI's relatively new product, Cody Cow. After considering all the factors, and viewing the evidence in the light most favorable to Gateway, the court finds that a genuine issue of material fact exists as to whether CPI's use of the cow spots diluted Gateway's trademark, and summary judgment to CPI is denied on this issue.

**[¶ 57] V. Deceptive Trade Practices—SDCL 37–24–6(1)**

[¶ 58] Gateway brought its claim for deceptive trade practices pursuant to SDCL 37–24–6(1) which provides:

It is a deceptive act or practice for any person to:

(1) Knowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been mislead, deceived, or damaged thereby[.]

*See Wyman v. Terry Schulte Chevrolet, Inc.,* 584 N.W.2d 103, 105 (S.D.1998) (corporations may be held liable for deceptive trade practices of its employees); *Moss v. Guttormson,* (any person adversely affected by deceptive trade practice has standing to bring action). Gateway did not respond to CPI's motion for summary judgment on this cause of action. As a result, the court finds there are no genuine issues of material fact in dispute and grants summary judgment to CPI on this cause of action.

**GATEWAY'S MOTIONS FOR SUMMARY JUDGMENT**

**[¶ 59] VI. Trademark Infringement, Unfair Competition, and Dilution Claims**

[¶ 60] Gateway moves for summary judgment on its trademark infringement, unfair competition, and dilution causes of action. The legal standards for asserting claims under these causes of action are set forth in sections I, II, and IV *supra.*

[¶ 61] Viewing the evidence in the light most favorable to CPI, there is a question of material fact on the issue of functionality as to whether Gateway's exclusive use of black and white cow spots on computer accessories puts competitors at a significant non-reputation-related disadvantage and whether CPI's use of black and white spots on Cody Cow is a functional use or an indication of sponsorship or origin.

[¶ 62] When applying the six-part "likelihood of confusion" test, CPI has identified several questions of material facts which preclude summary judgment. The first factor is the strength of Gateway's mark. There is evidence that Gateway's mark is not distinctive because cow spots are commonplace and used by multiple companies

on many products. If believed, this evidence would indicate that Gateway's mark is not a strong mark. CPI also challenges the validity of Gateway's evidence that consumers readily associate the cow-spots mark with Gateway and the fame of its mark. From the viewpoint of CPI, there is evidence that Gateway's mark is not strong and deserves only minimal protection.

[¶ 63] With regard to the second factor, similarity between Gateway's mark and CPI's cow spots, there is evidence that numerous other companies and organizations use phrases similar to "Welcome to Gateway Country" and produce products with black and white cow spots. Viewing the evidence in the light most favorable to CPI, there is evidence that CPI's Cody Cow and statement "Welcome to Stretch Pet Country" is common place and thus not similar to Gateway's registered trademarks.

[¶ 64] The third factor is the competitive proximity of the parties' products. CPI produced evidence that its product is not limited to use on computers, which places it in a different market than Gateway. Thus, CPI asserts its products are not in competitive proximity to Gateway and are not directed at the same market. Accordingly, whether Gateway and CPI are in close competitive proximity is a question of material fact for a jury to decide.

[¶ 65] The fourth factor is CPI's intent to confuse. CPI argues that it did not intend to copy nor did it actually copy Gateway's trademark. In fact, CPI asserts that Cody Cow is a common cow and not a spin-off of Gateway's trademark. CPI claims that any similarities in slogans are mere coincidence. CPI also points to its distinctive packaging that differs from Gateway's as evidence that CPI did not intend to copy any of Gateway's products. A reasonable jury could find that CPI did not intend to capitalize on Gateway's trademark when it created Cody Cow and that any similarities are coincidental.

[¶ 66] The fifth factor is evidence of actual confusion. CPI contests the validity of Gateway's survey and the method in which it was conducted. As a result, a genuine issue of material fact exists as to the credibility of the survey and the amount of confusion created by CPI's product.

[¶ 67] The sixth factor is the degree of care reasonably expected of potential customers, Although CPI does not disagree that its product is an impulse buy, it argues that a considerable amount of deliberation accompanies the purchase of its product. Furthermore, CPI cites its distinctive packaging, which greatly differs from Gateway's packaging, as evidence that reasonable consumers would not mistake CPI's product for that of Gateway's, This is an issue of material fact and therefore, should be left to a jury. After considering all six factors, the court finds that issues of material fact exist that preclude granting summary judgment to Gateway on its trademark infringement and unfair competition causes of action.

[¶ 68] On Gateway's dilution cause of action, CPI disputes the fame of the mark, noting that many consumers in Gateway's survey did not recognize Gateway's mark. CPI also claims that cow spots are associated with many non-Gateway products and therefore its use of cow spots on Cody Cow does not cause consumer confusion. CPI's evidence raises a question of material fact for the jury to resolve. A jury, therefore, must decide whether or not CPI's use of the black and white spots on Cody Cow dilutes Gateway's mark. Gateway's motion for summary judgment on the issue of dilution is denied.

[¶ 69] **VII. Misuse of Trademark**

[¶ 70] CPI alleges in its answer that Gateway's trademark should be canceled due to misuse because Gateway has unclean hands and has engaged in unfair business practices. CPI claims that Gateway improperly challenged and stopped the use of products that were manufactured by two corporations, Roundhouse Products and IMAK Products. The products manufactured by these corporations are not at issue in this litigation.

[¶ 71] Trademark misuse claims generally take the shape of either alleged antitrust violations or unclean hands. *See, e.g., Juno Online Servs. v. Juno Lighting, Inc.,* 979 F.Supp. 684, 688 (N.D.Ill.1997); *Estee Lauder, Inc. v. Fragrance Counter, Inc.,* 189 F.R.D. 269, 270 (S.D.N.Y.1999). The doctrine of unclean hands bars relief to a party who has acted improperly or in bad faith in relation to the controversy in issue. *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 814, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945). *See Iowa Health Sys. v. Trinity Health Corp.,* 177 F.Supp.2d 897, 925 (N.D.Iowa 2001) (doctrine of unclean hands applies to conduct involving fraud, deceit, unconscionability, or bad faith directly related to plaintiff's complaint). Although "equity does not demand that its suitors shall have led blameless lives as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue." *Precision Instrument,* 65 S.Ct. at 997 (citation omitted). The doctrine, therefore, applies when the "unconscionable act" of one seeking relief is immediately and necessarily related to the present litigation. *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245, 54 S.Ct. 146, 147, 78 L.Ed. 293 (1933). Because any past dealings with Roundhouse Products or IMAK Products would at most constitute unrelated misconduct,[2] the court finds as a matter of law that this evidence is not sufficient to establish unclean hands.

[¶ 72] CPI also alleges that Gateway's unclean hands arise from the correspondence Gateway sent to CPI and its customers in which Gateway used its trademark registration to stop CPI and its customers from selling Cody Cow. Aggressively promoting and protecting a trademark, however, does not constitute unclean hands. Indeed, "[i]n view of the strength of the mark and the very substantial good will attaching to it, plaintiffs can be expected to be, and are entitled to be, aggressive in asserting their [trademark] rights against others." *James Burrough Ltd. v. Lesher,* 309 F.Supp. 1154, 1161–62 (S.D.Ind.1969). If such conduct constituted unclean hands, plaintiffs would have to choose between policing their mark through vigorous efforts, which may include threats of suit or actual suits, or allowing general use to cheapen and dilute their mark. *Esquire v. Esquire Slipper Mfg. Co.,* 243 F.2d 540, 545 (1st Cir.1957). A plaintiff's zeal in enforcing its mark "may well have been born of overenthusiasm for its relatively weak mark rather than an attempt to browbeat and coerce." *Id.*

[¶ 73] Enforcing a trademark may appear to involve coercion or monopolization. *James Burrough,* 309 F.Supp. at 1162. The very requirement of registration, however, results in such monopolies. *La Maur, Inc. v. Alberto–Culver Co.,* 179 U.S.P.Q. 607, 615 (D.Minn.1973). Accord-

---

**2.** IMAK Products agreed to immediately stop the sale of its product after receiving a cease and desist letter from Gateway. After litigation was commenced, Roundhouse Products agreed to stop the distribution of its product. This court is not making a finding as to whether Gateway's trademark was infringed by IMAK and Roundhouse Products.

ingly, "[a] trademark owner is entitled to advise others of his trademark rights, to warn others that they or others are or may be infringing his rights, to inform others that he is seeking to enforce his rights through legal proceedings, and to threaten accused infringers and their customers with suit." *Leopold v. Henry I. Siegel Co.*, 2 U.S.P.Q.2d 1715, 1717 (S.D.N.Y.1987). *See LaMaur*, 179 U.S.P.Q. at 615 (trademark owner can use negotiation and litigation to enforce its registered rights).

[¶ 74] This policing of trademark rights extends not only to the actual infringer but also to purchasers from the alleged infringer, even if the goods were purchased innocently. *Spangler Candy Co. v. Crystal Pure Candy Co.*, 235 F.Supp. 18, 32 (N.D.Ill.1964). Since the owner of a trademark can rightfully halt all infringement, "[i]ts warning of suits for infringement may therefore properly be as widespread as the infringement.... It is immaterial whether the notice is given to the alleged infringer [or] its customers[.]" *Id.*

■■■ [¶ 75] It is not improper for a trademark holder to advise a competitor or its customers that the competitor's product infringes on its own trademark. *Letica Corp. v. Sweetheart Cup Co.*, 790 F.Supp. 702, 707 (E.D.Mich.1992). A trademark owner is entitled to warn potential infringers through letters, enforce its trademark rights through legal proceedings, threaten suit or ultimately file suit when the alleged infringement continues. *Id.* Furthermore, CPI has not cited any legal authority to support its claim that such letters constitute unfair trade practices or unclean hands. CPI has failed to support its assertion of misuse with any material facts; accordingly, Gateway is entitled to summary judgment on CPI's counterclaim of misuse.

**3.** Spartan voluntarily agreed to stop selling Cody Cow after receiving the cease and desist

## [¶ 76] VIII. Tortious Interference with a Business Relationship

■■■ [¶ 77] CPI alleges in its counterclaim that Gateway tortiously interfered with a business relationship. To establish a claim for tortious interference with a business relationship, a party must prove (1) a valid business relationship or expectancy exists; (2) the party interfering knows of the relationship or expectancy; (3) that party intentionally and unjustifiedly interfered; (4) the interference caused harm; and, (5) the party whose relationship or expectancy was disrupted was damaged. *McGreevy v. Daktronics, Inc.*, 156 F.3d 837, 841 (8th Cir.1998). A party cannot base liability for this tort on "speculation, conjecture, or guesswork, and no fact essential to submissibility can be inferred absent a substantial evidentiary basis." *Kirk v. Harter*, 188 F.3d 1005, 1009 (8th Cir.1999). Additionally, "competitive conduct is not tortious simply because it happens to interfere with another party's contracts or expectancies." *American Red Cross v. Community Blood Center of the Ozarks*, 257 F.3d 859, 862 (8th Cir.2001).

■■■ [¶ 78] There is no dispute that CPI established the first element: a valid business relationship existed between CPI and Spartan Promotions and Computer-Gear. CPI, however, failed to present any evidence to meet its burden of proof on the second and third elements.

[¶ 79] With regard to the second element, it is CPI's burden to prove that Gateway knew a business relationship existed between CPI and Spartan Promotions or ComputerGear. CPI cites a letter Spartan sent Gateway in response to Gateway's cease and desist letter as evidence that Gateway knew of Spartan's relationship with CPI. The letter,[3] however,

letter from Gateway.

was sent to Gateway in response to Gateway's cease and desist letter. It does not establish knowledge that Gateway knew of a business relationship between CPI and Spartan before the cease and desist letter was sent to Spartan.

[¶ 80] Next, CPI argues Gateway knew of the relationship between ComputerGear and CPI because Gateway sent a cease and desist letter to ComputerGear after contacting CPI. CPI contends that since Gateway knew of CPI's products, Gateway should have known that CPI supplied ComputerGear with Cody Cow. CPI's inference, however, fails to establish Gateway's knowledge of a business relationship between ComputerGear and CPI. Knowledge of similar products does not prove knowledge of a business relationship.

[¶ 81] CPI has also submitted no proof that Gateway interfered with CPI's business intentionally and without justification. While Gateway did intentionally send cease and desist letters to both Spartan and ComputerGear, Gateway's act was justified by its right to protect its registered trademark. Moreover, there is no evidence that Gateway intended to interfere with CPI's business relationships. The only evidence is that Gateway intended to protect its trademark. Without knowledge of these business relationships and without evidence of intent to harm CPI, Gateway can hardly be found to have intentionally and unjustifiedly interfered with such business relationships.

[¶ 82] Because CPI failed to submit evidence to meet the second and third prongs of tortious interference with a business relationship, the fourth and fifth factors need not be reached. Gateway is therefore entitled to summary judgment on this claim.

## [¶ 83] IX. Defamation

[¶ 84] South Dakota state law governs CPI's claim of defamation. A statement may be actionable as defamation if it implies a false assertion of objective fact. *Paint Brush Corp. v. Neu,* 599 N.W.2d 384, 397 (S.D.1999). If the statement contains such an assertion, a party must prove that it is either libel or slander. *Id.* "Libel is a false and unprivileged publication by writing ... which has a tendency to injure him in his occupation." SDCL 20–11–3. Defamation, however, does not ensue if the communication is privileged and made without malice. *Paint Brush Corp.,* 599 N.W.2d at 397.

### [¶ 85] A. False Assertion of Objective Fact

[¶ 86] In a summary judgment motion, a court must determine whether a reasonable fact finder could determine that a statement constituted a false assertion of objective fact. *Id.,* (quoting *Lundell Mfg. Co. v. American Broadcasting Companies,* 98 F.3d 351, 359 (8th Cir.1996)). In this case, although CPI argues that Gateway's letters to Spartan and ComputerGear are false assertions of objective fact, CPI does little more than state a legal conclusion without citing any supporting facts. Indeed, CPI declares that these letters state that CPI's cow infringed on its trademark rights. The letters, however, do not even implicate CPI; rather the letters express Gateway's good faith belief that Spartan's and ComputerGear's products infringed on Gateway's trademark. CPI has thus failed to establish that Gateway asserted either an objective fact or a falsity.

### [¶ 87] B. Privilege

[¶ 88] A privileged communication is one made "without malice, to a person interested therein, by one who is also interested or by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication inno-

cent." SDCL 20–11–5(3). Conditional privilege exists when "circumstances lead several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know." *Paint Brush Corp.*, 599 N.W.2d at 398. Privilege is always a defense in a defamation action, but it is lost if the speaker acts with malice. *Setliff v. Akins*, 616 N.W.2d 878, 891 (S.D.2000). In determining whether a communication is privileged, a court should first consider the individuals and the circumstances involved. *Paint Brush Corp.*, 599 N.W.2d at 397.

[¶ 89] The common subject matter in this case is the use of cow spots on computer-related goods. Spartan and ComputerGear are both interested parties since their infringement could subject them to direct liability. *See El Greco Leather Prod. Co. v. Shoe World, Inc.*, 806 F.2d 392, 396 (2d Cir.1986) (retail seller of a product, who is not involved in manufacture or use of infringing mark, may be liable for infringement); *Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Dist. Pty. Ltd.*, 647 F.2d 200, 207 (D.C.Cir.1981) (any member of distribution chain of infringing products may be used as alleged tortfeasor). Thus, Spartan and ComputerGear were entitled to the information in the cease and desist letters. This brings Gateway's communications under the cover of conditional privilege. CPI does not rebut this claim of privilege. Thus, there are no disputed facts related to conditional privilege of the letters.

## [¶ 90] C. Malice

[¶ 91] A defamation suit involving a privileged communication requires proof of malice. *Paint Brush Corp.*, 599 N.W.2d at 398. A party must specifically prove malice; it is not inferred from the circumstances. *Id.* "The real test of

whether a [party's] conduct is reckless so as to constitute actual malice is whether he in fact entertained serious doubts as to the truth of his publications. . . . Reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *Id.* Indeed, the failure to investigate, without more, does not constitute malice. *Peterson v. City of Mitchell*, 499 N.W.2d 911, 916 (S.D.1993).

[¶ 92] CPI has failed to produce evidence of malice in this case. CPI states that Gateway's vigilant enforcement of its trademark and its failure to investigate the infringement claims amounts to malice. CPI has not, however, alleged any facts indicating that Gateway had any serious doubts as to the truth of the contents of its cease and desist letters. Additionally, CPI has not offered evidence that Gateway's letters contained known falsehoods. Although CPI cites Gateway's lack of investigation into Spartan's and ComputerGear's products, a failure to investigate the source of the products is not malice because distributors of infringing products can also be subjected to Lanham Act liability. *El Greco*, 806 F.2d at 396. The lack of specific proof by CPI undermines a claim of malice. As a result, Gateway's communications remain protected by privilege and negate a defamation claim. Gateway's motion for summary judgment on the claim of defamation is granted.

## [¶ 93] X. Disparagement

[¶ 94] South Dakota imposes liability for disparagement for the publication of a false statement that harms the interests of another if the person intends, recognizes, or should have recognized that harm would likely result and if the person knows the statement is false or acts in reckless disregard of its truth. *Paint Brush Corp.*, 599 N.W.2d at 399. CPI's

disparagement claim fails for the same reasons as its defamation claim. First, CPI has not alleged any facts that indicate that Gateway intended to harm it. By sending letters to Spartan and Computer-Gear, Gateway intended to protect its trademark, not disparage CPI.

[¶ 95] Next, because there is no evidence that Gateway knew of CPI's association with Spartan or ComputerGear when sending the cease and desist letters, Gateway could not have recognized any possible harm to CPI. Furthermore, Gateway believed in good faith that Spartan's and ComputerGear's cow-spotted products infringed on Gateway's trademark. CPI has proved neither knowledge of falsity by Gateway nor reckless disregard for the truth of its allegations. Unsupported allegations do not amount to disputed fact. *Anderson,* 106 S.Ct. at 2506; Fed.R.Civ.P. 56(e). In the absence of such evidence, Gateway is entitled to summary judgment in its favor on the disparagement claim.

[¶ 96] Accordingly, it is hereby

[¶ 97] ORDERED that CPI's motion for summary judgment (Docket 37) on the issues of trade dress infringement, trademark infringement, state common-law claims of trademark infringement, and dilution are denied.

[¶ 98] IT IS FURTHER ORDERED that CPI's motion for summary judgment (Docket 37) on the deceptive trade practices cause of action is granted.

[¶ 99] IT IS FURTHER ORDERED that Gateway's summary judgment motion (Docket 30) based on the claims of misuse of its trademark, tortious interference with business relationships, defamation, and disparagement are granted.

[¶ 100] IT IS FURTHER ORDERED that Gateway's summary judgment motion (Docket 27) on the claims of trademark

infringement, unfair competition, and dilution are denied.